J-A08025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HOSEA HOLCOMB, IV | : | |
| | : | |
| Appellant | : | No. 621 WDA 2022 |

Appeal from the Judgment of Sentence Entered April 8, 2022
In the Court of Common Pleas of Washington County Criminal Division at
No(s): CP-63-CR-0000241-2021

BEFORE: STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.: **FILED: May 19, 2023**

Hosea Holcomb, IV ("Holcomb") appeals from the judgment of sentence imposed following his conviction for accidents involving death or personal injury.[1]  We affirm.

The trial court provided the following factual and procedural history of this case:

> On January 11, 2021, James Hamilton [("Mr. Hamilton")] was driving on eastbound on 1-70 when he noticed a tractor-trailer swerving in between lanes on the highway, and crossing over the fog lines on . . . both sides of the highway.  [Mr.] Hamilton is a trained EMS worker with Washington County and was off duty at the time, but he called 911 and reported what he saw to a dispatcher.  He related that the driver of the tractor-trailer "could not maintain the lane" while he was driving.  [Mr. Hamilton] began

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 75 Pa.C.S.A. § 3742(b)(3).  Following a non-jury trial, the trial court convicted Holcomb of several related offenses not at issue in this appeal, including homicide by vehicle.  **See** 75 Pa.C.S.A. § 3732.

to relay the license plate number of the tractor-trailer to the dispatcher[,] and read it as follows: 3724722. He then read the trailer's identifying number, located on the rear door in the top right corner, as follows: W07683. After hanging up with 911[,] Mr. Hamilton continued to follow the tractor-trailer for several minutes.

Mr. Hamilton stated that he had noticed a person wearing a reflective vest on the side of the road, standing on the driver side of a tractor-trailer, which was on the right shoulder of I-70. This was later determined to be the victim, [John Isenberg ("Mr. Isenberg")], and the [tractor-]trailer was Mr. Isenberg's . . .. Mr. Hamilton testified that on the night in question, the hazard lights on Mr. Isenberg's [tractor-]trailer were operational and blinking. Mr. Hamilton then witnessed [Holcomb's] tractor-trailer strike both Mr. Isenberg and his [tractor-]trailer at a speed of around 65 [miles per hour]. Mr. Hamilton stated that he saw Mr. Isenberg fly into the air and fall on the pavement in front of his parked [tractor-]trailer. Mr. Hamilton testified that he then proceeded to park his car around 50 feet in front of Mr. Isenberg's [tractor-]trailer. Mr. Hamilton then went to Mr. Isenberg's body to attempt to provide life-saving measures . . .. However, Mr. Hamilton stated that there was no saving Mr. Isenberg[,] and he witnessed Mr. Isenberg take his last breath.

Mr. Hamilton reported that he stayed at the scene for quite some time after the accident occurred and did not manipulate Mr. Isenberg's body in any way during this time. Mr. Hamilton stated that [Holcomb] never returned to the scene of the accident.

Trooper [Jason A.] Altman testified that he is a member of the Pennsylvania State Police [("PSP")] Forensic Services Unit. Trooper Altman took photos of[, *inter alia*,] the damage to [Mr. Isenberg's tractor-]trailer, Mr. Isenberg's body, and the area surrounding the crime scene. Trooper Altman testified that he did not alter Mr. Isenberg's body in any way while he was taking his photographs. Trooper Altman first took photos of Mr. Isenberg's boot, which was located in the grass area next to the highway. Trooper Altman testified that the hood of Mr. Isenberg's [tractor-]trailer was open when he arrived on the scene.

After photographing the scene of the accident, Trooper Altman proceeded to the location where [Holcomb] was being held. Trooper Altman noticed a large scuff on the passenger side of Holcomb's [tractor-]trailer. The scuff was located right behind

- 2 -

the passenger door, and was very noticeable to Trooper Altman because it was bright white[,] and the rest of the [tractor-]trailer was covered in ash from the highway. The next thing that Trooper Altman noticed was a large crack in one wheel on the passenger side of the [tractor-]trailer. Upon further inspection, Trooper Altman observed two blue fibers stuck in the wheel cover. Next, Trooper Altman took photographs of a tissue-like substance that was stuck in the landing gear on the passenger side of the [tractor-]trailer. Lastly, he noticed that there was a blood stain on the ICC bar located at the rear of the [tractor-]trailer.

Trooper [Todd Stephenson] is a member of the [PSP] Aerial Unit and arrived [at] the scene of the accident shortly after the other Troopers. He took aerial photos of the accident scene. Upon review of these photos, Trooper [Stephenson] noticed that there was a visible line from the front of [Mr. Isenberg's] trailer and extending a few feet in front of the trailer in the direction of where Mr. Isenberg's body was found. Trooper [Stephenson] testified that highway pavement is porous and clothing fibers can be ground into this porous material when enough force is applied. He then testified that Mr. Isenberg's boot color was very similar to the color of the line that was seen in the pavement.

After taking photos of the accident scenes, Trooper [Stephenson] then proceeded [to] where [Holcomb] was apprehended. He inspected the scene and took additional photos of the fibers that were lodged in the wheel[s] of [Holcomb's tractor-] trailer. Trooper [Stephenson] testified that the material was not sent to a lab for analysis. However, he did testify that his training and experience [led] him to believe that the fibers found in the wheel[s] were consistent with jean fibers. [Mr. Isenberg was wearing blue jeans.]

Upon review of the [Holcomb's] tractor-trailer dashboard video, [Holcomb] is seen falling asleep behind the wheel. The footage captured on the trailer's exterior camera shows that [Holcomb] was in fact swerving his trailer from side to side on the highway. . . . [T]he video definitively shows that Mr. Isenberg's hazard lights were blinking at the time that [Holcomb] approached the parked vehicle. Lastly, [one] can hear [Holcomb] saying[,] "[O]h shit[,]" after a crunching sound is heard as he is passing Mr. Isenberg's truck. [Stephenson] also testified that [Holcomb] never returned to the scene of the accident.

The last person to testify on the second day of the trial was Trooper [Zachary] Casini. Trooper Casini arrived on the scene after being dispatched to the scene with a report of a motor vehicle crash involving a pedestrian. Trooper Casini testified that he saw Mr. Isenberg's body as soon as he arrived on scene. Trooper Casini had the interstate shut down and then called the coroner's office to the scene. Trooper Casini testified that Mr. Hamilton's vehicle was the only vehicle at the scene of the accident when he arrived. Trooper Casini confirmed that the victim at the scene was Mr. Isenberg by checking his [identification] card in his wallet.

After interviewing Mr. Hamilton, Trooper Casini then proceeded to a second scene where Trooper [Jacob] Roberts reported that [Holcomb] had been detained. When Trooper Casini arrived [at] the second scene he found a tractor[-]trailer with a license plate number that matched the one provided to 911 from Mr. Hamilton. Trooper Roberts and Trooper Casini took [Holcomb] to their barracks to be interviewed. Trooper Casini testified that he read [Holcomb] his **Miranda** [**v. Arizona**, 384 U.S. 436 (1966) r]ights and [Holcomb] indicated to both Trooper[s] Roberts and Casini that he understood these rights. [Holcomb] was then given a Custodial Written Statement document. [Holcomb] read this document in front of Troopers Casini and Roberts and then filled out the document. At the bottom of the first page of the Custodial Written Statement . . ., [Holcomb] wrote:

> I was driving on [I-]70E and I had knodding [sic] off then swirled [sic] to miss a parked semi-truck on the right shoulder. As I swirled [sic] I hit the driver without knowing[.] I didn't stop to check to make sure I didn't hit anyone or anything. Because I thought I had cleared the truck. Now my mistake costed [sic] someone [sic] life.

. . . Further, the coroner's report indicated that Mr. Isenberg's death was blunt force trauma of the head, trunk, and extremities. . . . [Holcomb] . . . submit[ted] to a blood screen[] on the night in question[,] and his blood test came back negative for alcohol and any other illicit substances/metabolites.

On the third day of the trial[,] . . . Trooper Roberts testified that he was the [t]rooper who pulled [Holcomb over] on the day in question. Trooper Roberts is a certified Motor Carrier Inspector under the Motor Carrier Safety Assistance Program . . .. Once Trooper Roberts initiated the traffic stop, he identified [Holcomb]

- 4 -

and then read him his **Miranda** [w]arning. [Holcomb] stated to Trooper Roberts that he understood these rights. Trooper Roberts testified that [Holcomb] did not exhibit any signs of intoxication during their conversation. [Trooper] Roberts also stated that [Holcomb] was extremely cooperative with him while he was questioning him at the scene, and remained cooperative during his questioning back at the PSP barracks. Trooper Roberts testified that he noticed that there was damage to the passenger side wheel hub caps on the second and third axels. Trooper Roberts also observed what appeared to be clothing fibers of blue [] jeans stuck in the damaged wheels. A video recording that was taken from the dash cam of Trooper Robert's vehicle was then played for the [c]ourt to observe.

In the video[,] Trooper Roberts asked [Holcomb] if he remembered hitting someone[,] to which [Holcomb] replied, "I promise I never hit anybody." Later in the video, [Holcomb] stated that he had not consumed any intoxicating substances recently. However, [Holcomb] did admit that he was driving at a speed of around 68 [miles per hour, though he would later testify he was going 65 miles per hour]. After this video was played, the recording taken at the PSP barracks was then played for the [c]ourt to review.

In the barracks video, [Holcomb] admitted that he did not sleep well prior to the day of the accident and that he slept a total of 5 hours. He said that he fell asleep around 9:30 [p.m.] the night before, woke up at 2:30 [a.m.,] and was on the road by around 3:00 [a.m.] [Holcomb] admitted in the video that he might have been nodding off a little on the road and, because he noticed he was tired, [Holcomb] . . . stopped off in Washington County for a quick 45-minute power nap prior to the accident involving [Mr. Isenberg]. [Holcomb] also told Trooper Roberts that he did not eat anything the day of the accident.

\* \* \* \*

Lastly, [Holcomb] told Trooper Roberts in the video that he has never been cited by the Department of Transportation for any inspection violation of his work vehicle. Trooper Roberts then asked [Holcomb] how his wheels became damaged. [Holcomb] told Trooper Roberts that he was confused about that because he had completed a pre-trip inspection of his vehicle and the wheels were not damaged at the time of this inspection.

\* \* \* \*

- 5 -

[Holcomb] took the witness stand [at trial] and testified that[,] on the day in question[,] he left from London, Ohio and was driving to a destination in Maryland. He said that while on route he . . . notice[d] [Mr. Isenberg's] truck on the side of the road, and noted that the hazard lights were flashing. [Holcomb] testified that he believed he was veering towards [Mr. Isenberg's] truck. [Holcomb] then testified that as he approached the vehicle[,] he attempted to take a sharp left, and thought that he had cleared the vehicle without hitting it. However, the video from his tractor trailer shows that his eyes were closed right before he hit the vehicle and that he did not move the wheel until after passing [Mr. Isenberg's] tractor trailer.

[Holcomb] was then questioned about the video footage taken from the cameras on his tractor trailer. [Holcomb] testified that the reason he had said[,] "Oh shit[,]" after he passed [Mr. Isenberg's] tractor trailer was because it was a close call. He also testified that the reason he made a sign of the cross a minute after he said[,] "Oh shit[,]" was because he was making a prayer thanking God that he had not gotten in an accident with the parked trailer.

On cross-examination, [Holcomb] stated that he did not know he was yawning while driving his tractor-trailer. The Commonwealth then played the interior video of [Holcomb's] truck showing that [Holcomb] yawned a total of four separate times prior to striking Mr. Isenberg. It was also quite apparent to th[e c]ourt that [Holcomb] was veering in between both lanes of the highway and onto the shoulder of the highway. At one point during the trial, the video was paused at a time where it reflected that [Holcomb's] tractor[-]trailer was in the center of both lanes of the highway. [Holcomb] then admitted that had another vehicle been driving past him at this time that he could have hit said vehicle.

[Holcomb] testified on cross-examination that he did not see [Mr. Isenberg's] tractor[-]trailer until the last second. The Commonwealth paused the video multiple times trying to gauge when [Holcomb] saw [Mr. Isenberg's] parked [tractor-]trailer. [Holcomb] had the Commonwealth pause the video from his [tractor-]trailer's external facing camera when [Holcomb's] truck appeared to be incredibly close to [Mr. Isenberg's] truck. [Holcomb] also reiterated that he did not see [Mr. Isenberg] on the day in question. The [c]ourt must note that on the video playback, especially at the paused moment when [Holcomb]

- 6 -

testified that he saw [Mr. Isenberg's] [tractor-]trailer and that he was driving toward it, [Mr. Isenberg's] body is in fact visible in the video, and he was wearing a reflective vest at the time. Lastly, [Holcomb] did admit that he was driving at a rate of 6[5] MPH as he approached [Mr. Isenberg's] trailer, and admitted that the designated speed limit on this highway was 55 MPH.

[Following the trial, at the conclusion of which the trial court convicted Holcomb of, *inter alia*, the *supra* offenses, the court sentenced Holcomb to, among other things, an aggregate sentence of incarceration for three-and-a-half to seven years. Holcomb] filed [a] post-sentenc[e] motion[] on April 18, 2022.

Trial Court Opinion, 4/26/22, at 3-10 (footnotes and citations to the record omitted; some paragraphs re-ordered for clarity). The trial court denied Holcomb's post-sentence motion, and Holcomb timely appealed. The trial court did not order Holcomb to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b); however, the trial court, per Rule 1925(a), nevertheless directed this Court to its April 24, 2022 opinion disposing of Holcomb's post-sentence motion.[2]

Holcomb raises the following issue for our review:

Is the evidence of record insufficient as a matter of law to support [] Holcomb's conviction for accident[s] involving death or personal injury (death results)[,] where the Commonwealth failed to prove beyond a reasonable doubt that [] Holcomb knew[,] or reasonably should have known[,] that he had struck a pedestrian with the passenger side of his tractor-trailer combination, where the evidence presented at trial unequivocally demonstrates that he neither knew such accident had occurred nor that he should have known such accident had occurred?

_____

[2] The trial court, in *lieu* of a Rule 1925(a) opinion, opted to specify the location in the record where its reasoning appears. The court, however, mislabeled its Rule 1925(a) specification as a "1925(b) order." **See** Order, 5/25/22.

Holcomb's Brief at 8 (unnecessary capitalization omitted).

Holcomb [thus] challenges the sufficiency of the evidence for his accidents involving death or personal injury conviction. Our standard of review for sufficiency claims is as follows:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by a fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lowry*, 55 A.3d 743, 751 (Pa. Super. 2012) (internal citation omitted).

Section 3742 of the Motor Vehicle Code ("MVC") provides, in relevant part, as follows:

> **(a) General rule.--**The driver of any vehicle involved in an accident resulting in injury or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of section 3744 (relating to duty to give

information and render aid).  Every stop shall be made without obstructing traffic more than is necessary.

**(b) Penalties.—**

\* \* \* \*

(3)(i) If the victim dies, any person violating subsection (a) commits a felony of the second degree, and the sentencing court shall order the person to serve a minimum term of imprisonment of not less than three years and a mandatory minimum fine of $2,500, notwithstanding any other provision of law.

\* \* \* \*

75 Pa.C.S.A. § 3742.  "Previous decisions from our Court interpreting [s]ection 3742 clearly establish that a conviction under that section requires the Commonwealth to establish that the 'driver knew or should have known' that he was involved in an accident involving personal injury or death." **Lowry**, 55 A.3d at 751 (internal citations omitted).

In his sole appellate issue, Holcomb challenges the sufficiency of the evidence supporting the trial court's conclusion that he knew or should have known he was involved in an accident, because, he asserts, "[t]he evidence at trial is absent any articulable fact that [he] knew or reasonably should have known that he had been involved in an accident . . .."  Holcomb's Brief at 18. Holcomb asserts that the video from the interior-facing dashboard camera inside of his vehicle does not show that his eyes were closed before the accident and then opened only after he heard the sound of his tractor-trailer striking Mr. Isenberg.  **See id**. at 25.  Holcomb further argues he testified credibly that he did not know he had been involved in an accident, but instead

believed he had "almost" been in an accident. *See id*. at 26. He further argues that his post-accident conduct suggests he did not know he had been in an accident: he took no evasive action thereafter; he was cooperative with police; he voluntarily gave statements; and in those statements, he said he had not known he hit Mr. Isenberg. *See id*. at 27. Holcomb additionally argues that the video does not establish he could hear the sound of his vehicle striking Mr. Isenberg. *See id*. at 29.

The trial court considered Holcomb's challenge to the sufficiency of the evidence in this respect and concluded it merited no relief:

> [Holcomb] testified that on the morning in question, he swerved left in an attempt to avoid hitting the vehicle, did not feel anything, and did not hear anything as he passed [Mr. Isenberg's] trailer. This [c]ourt finds this to be unconvincing. The video from [Holcomb's] trailer shows that [Holcomb's] eyes closed as he approached [Mr. Isenberg's] trailer. [Holcomb] must have felt or heard something because his eyes did not open until the banging sound was heard as he was passing [Mr. Isenberg's] trailer. There was also an audible sound on the video playback from [Holcomb's] trailer. Additionally, [Holcomb] said[,] "Oh shit[,]" immediately after this incident, and looking in both side-view mirrors. This is indicative that [Holcomb] acknowledged that something had just occurred. Further, [Holcomb] said[,] ["O]h shit[,]" a second time[,] and made a sign of the cross on his body after the accident. Even after Trooper Roberts stopped him, [Holcomb] proffered to the [t]rooper that something must have occurred to cause his wheels to become damaged since they were unscathed in his pre-trip inspection of his trailer. These actions, when viewed in an aggregate[,] lead this [c]ourt to find that [Holcomb] either knew or should have known that an accident occurred with [Mr. Isenberg] and his trailer.

Trial Court Opinion, 4/26/22, at 12-13 (footnotes omitted).

- 10 -

Following our review, and viewing the evidence in the light most favorable to the Commonwealth as the verdict-winner, we conclude the evidence was sufficient for the trial court to find beyond a reasonable doubt that Holcomb knew or should have known he had struck Mr. Isenberg with his tractor-trailer, thereby causing personal injury or death. Holcomb conceded at trial that the sound of a "thump" was audible in the interior cab video. N.T., 1/14/22, at 87. Additionally, Holcomb admitted that, after the "thump," he began to turn his head, and "[t]hat's when I was looking in the mirror." *Id*. at 87. Holcomb admitted that he "knew something happened," *id*. at 93, but that "[he] didn't know for sure whether [he] hit something or whether [he] didn't hit something." *Id*. at 89. Shortly after the collision, he audibly uttered "shit." *Id*. at 91. Holcomb additionally uttered a second "shit" after driving a "little bit f[a]rther down the road," and then he made the sign of the cross. *Id*. at 92. Holcomb conceded that, following the accident, he "remarked on it either verbally or non-verbally three separate times . . . ." *Id*. Holcomb further testified as follows:

> **Q:** But here . . . you have three different times that you've remarked on it, and at no time did you stop your vehicle, right?
>
> **A:** Correct.
>
> &ast; &ast; &ast; &ast;
>
> **Q:** Even though you know that something happened. That's why your attention is drawn to it, right? That's why you look over, right?
>
> **A:** Correct.

- 11 -

*Id*. at 93. Moreover, the video reveals that Holcomb was traveling sixty-five miles per hour prior to the time of impact; and, around the time of impact, his speed was sixty-three miles per hour, and he then slowed down to sixty miles per hour. *See* N.T., 1/14/22, at 83-84 (Holcomb conceding he had been traveling sixty-five miles per hour); *see also* N.T., 12/7/21, at 75-76 (testimony by Trooper Stephenson that Holcomb slowed down to sixty-three and then sixty miles per hour around the time of the accident). In sum: after Holcomb audibly struck Mr. Isenberg, he (Holcomb) slowed down, looked in his mirror, uttered "shit," once near contemporaneously, the other after traveling some distance, and, further, then made the sign of the cross.[3]

This evidence, taken in the light most favorable to the Commonwealth as verdict-winner, circumstantially establishes that Holcomb knew or should have known that he was involved in an accident involving personal injury or death, but, nevertheless, continued driving. *See Lowry*, 55 A.3d at 751 (stating that "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence"); *see also id*. 751-52, 752 n.6 (holding that, "While Appellant's theory that he knew nothing about the accident was one presented

_____

[3] Trooper Roberts additionally testified that there were what appeared to be "fresh scrapes" to the covers on the second and third wheels on the passenger side of Holcomb's cab with what appeared to be "small fibers of what looked like blue jeans or clothing in the wheels themselves, in the rim." N.T., 1/14/22, at 15. Holcomb later volunteered that this damage was, to his knowledge, new. *See id*. at 33.

- 12 -

to the [fact-finder], and one that the [fact-finder] was entitled to accept, the [fact-finder] rejected that theory and instead adopted the Commonwealth's version of the events that day," and that credibility determinations are "not subject to our appellate review").

Judgement of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   5/19/2023